**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LANDASH CORPORATION, | § | CASE NO. 2:18-bk-50300 |
| Debtor | § | |
| | § | |
| | § | Chapter 7 |

_____

| | | |
|---|---|---|
| LUCIEN J. TUJAGE, JR. | § | |
| | § | |
| | § | |
| v. | § | ADVERSARY NO. _____ |
| | § | |
| | § | |
| THE CASTRO FAMILY TRUST, LLC | § | |


**<u>PLAINTIFF LUCIEN J. TUJAGUE, JR.'S  ORIGINAL ADVERSARY COMPLAINT
AGAINST THE CASTRO FAMILY TRUST, LLC</u>**

TO THE HONORABLE KATHRYN PRESTON
UNITED STATES BANKRUPTCY JUDGE


NOW COMES Plaintiff, Lucien J. Tujague, Jr. and files this his Plaintiff's Original Complaint against the Castro Family Trust, LLC. In summary, the Castro Family Trust, LLC is a trust controlled by family insiders John Keith Eckerd, a principal co-conspirator of the off-the-road tire conspiracy related to the Landash Corporation bankruptcy.

## I.

## JURISDICTION AND VENUE

1.	This adversary proceeding arises from the Chapter 7 case of Landash Corporation styled and numbered *In re Landash Corporation,* Case No. 2:18-bk-50300**,** (the "Bankruptcy Action"), now pending before the Court. This adversary proceeding was instituted when the Judge Amos Mazzant of the Sherman Division of the U.S. District Court for the Eastern District of Texas transferred Plaintiff's to the U.S. District Court for the Southern District of Ohio for referral to this Court. Judge Mazzant did so, finding that the fraudulent transfer claims against the Castro insiders were core proceedings of the bankruptcy estate.

2.	The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a proceeding to determine, avoid, and recover fraudulent transfers and thus is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), (A), (I), and/or (O).

3.	Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.

## PARTIES

4.	 Plaintiff is a citizen of the United States, the State of Texas, and a resident of Dallas County, Texas.

5.	Defendant THE CASTRO FAMILY TRUST, LLC is a limited liability company and may be served with process by serving one or both of its managing members DONNA CASTRO or DAN CASTRO at their residence at 5313 Settlement Way, McKinney, Texas 75070 or wherever they may be found.

# III.

# FACTS

## ADKINS LURES PLAINTIFF TO INVEST $12.9 MILLION
## IN MINING AND INDUSTRIAL TIRE BUSINESS

8. Plaintiff Lucien J. Tujague, Jr. is a Dallas businessman and investor. In late 2015, a mutual acquaintance introduced Plaintiff to Jason Adkins, a resident of Ohio. Based on a number of representations Adkins made to him about his skills, knowledge, and relationships in the sale of "Off the Road" (OTR) tires, massive specialized tires employed on mining, construction, and industrial sites, Plaintiff and Adkins began communicating about Plaintiff investing in enterprises related to the acquisition and sale of the tries. OTR tires are gigantic tires specially designed for heavy mining and industrial applications and are commonly seen on "Mega" Truck manufactured by companies, like Caterpillar. Because of their massive size, and specialized use they can sell for anywhere between $35,000 to $100,000. As a result of the substantial expense of the tires, and the unpredictable timing and duration of their use at a particular work site, there is a substantial secondary brokerage between users and wholesale distributors. It was this market that Adkins had enticed Plaintiff, who had had great success in the energy and real estate businesses, but was completely new to this market, to invest in the OTR tire business.

## PLAINTIFF INVESTS $12.9M AS ADKINS CONTINUES TO TRAP HIM

12. Following Adkins's solicitations to Plaintiff here in Texas, over the two years that followed, Plaintiff invested, at least, $12,920,550.00 in some forty transactions. The first transaction occurred on **February 18, 2016** and the last occurred on or about **November 14, 2017**. Plaintiff's payments were drawn from electronic wires from his bank in Dallas County, Texas.

13. As the information was presented to Plaintiff, Adkins would apprise him of one or more deals by phone or email. The information would identify the supplier of the tires, and the end consumer, often a mining or construction firm. Adkins would also identify any other potential investors in the transaction. Adkins would often suggest to Plaintiff that he could cover the entire transaction, so that others "wouldn't be able to get in on the deal."

14. Adkins would provide proof that he had already acquired the tires thus causing Plaintiff to wire funds to Adkins through his Landash Corporation. What Plaintiff did not know, though, was that the money and/or the proceeds of transactions were being diverted to Adkins and his co-conspirators. During this period, the 38-year-old Adkins had virtually daily communications with Plaintiff. Adkins solicited his friendship, flying him on planes that Adkins asserted he owned, introducing him to associates, and allowing him to inspect tire inventories at the Houston XPO location. Adkins further lured Plaintiff into his trust by inviting Plaintiff to his home in Ohio, and to Cleveland Cavalier basketball games, among other outings and events.

## LANDASH AND ADKINS GO BANKRUPT

15. In the summer of 2017, Adkins began communicating with Plaintiff through his attorney. Adkins and the attorney urged to Plaintiff that the bankruptcy will not affect Plaintiff's investments. On January 22, 2018, Landash files its Chapter 11 Bankruptcy in the Southern District of Ohio in Cause No. 2:2018-BK-50300. Only weeks later on February 9, 2018 Adkins files his own Chapter 7 bankruptcy in the Southern District of Ohio, as well, in 2:2018-BK-50671.

16. In only weeks, it is soon apparent that the bankruptcy too is a sham. At an initial hearing of his own bankruptcy, Adkins appears only by phone, asserting a dubious ailment. He then repeatedly invokes his privilege against self-incrimination. He subsequently failed to

PLAINTIFF'S ORIGINAL COMPLAINT

cooperate with the bankruptcy trustee. On June 1, 2018, the bankruptcy trustee moved for default in an adversarial proceeding against Adkins. It soon becomes apparent that many of the transactions were elaborate contrivances that was one-part Charles Ponzi, and one-part Billy Sol Estes. In those instances where tires were actually acquired, they were not delivered to the end users. Plaintiff did not receive any of his $12.9 million, much less than the large gross profits anticipated from more than $75 million in total tire sales. Agreeing with the trustee, On June 29, 2018, this Court entered judgment holding that Adkins could not discharge any of his debts and dissolving the stay of litigation.[1] (Dkt. #113).

## WHERE THE MONEY WENT

17. Through various shell companies, Defendant Adkins, co-conspirator and others John Eckerd[2] controlled Landash Corporation, and its related entities, including LANDASH TX, LLC. Plaintiff has since learned that following a number of transactions, portions of funds sent to Landash or Adkins were then delivered to Eckerd. Adkins and Eckerd have, furthermore, an established pattern of defrauding creditors in relation to tire transactions. *See Case Pro-logistics Forwarding LTD. v. Robison Tire Co., Inc.* Civil Action No. 2:13-CV-83, U.S. District Court, Southern District of Mississippi—Hattiesburg Division; *Star Funding v. Vault Minerals, et al.*, Civil Action No. 1:15-CV-3026, U.S. District Court, Southern District of New York.

---

[1] *See Bullard v. Blue Hills Bank,* 135 S.Ct. 1686, 1692-93, 191 L.Ed. 2d 621 (2015).

[2] The organized nature of this conspiracy stretches back to 2010 and continues forward to the present. In other litigation filed by Abington Capital, Defendant Eckerd expressly represented himself as an officer and employee of the defendant who worked with Jason Adkins and again received a multi-million dollar loan for the acquisition of tires located here in Texas, but which did not and do not exist.

## ADKINS AND ECKERD DIVERT MONEYS TO SHELL COMPANIES AND ENTITIES HELD BY RELATIVES

26. In discovery gathered in *Tujague v. Eckerd* and other actions, witnesses have suggested that Adkins was not worried about losing any assets as he had assets "in his wife's name" and "offshore." One witness indicated that Adkins had transferred as much as $12 million abroad.

28. Eckerd executed a similar plan, diverting money from his family trust, La Mia Bella Famiglia, and from other entities, including Euro Tread Corporation to the Castro Family Trust. As indicated previously, the Castros are the parents of John Eckerd's wife, Lauren Castro Eckerd. According to records, Eckerd and his co-conspirators have transferred at least **$3,453,000** to an account held in the name of **Castro Family Trust at Bank of Texas** since January of this year.

| | | |
|---|---|---|
| La Mia Bella Famiglia | Feb 21, 2018 | $  372,000.00 |
| Euro Tread Corp. | Mar 20, 2018 | $1,164,000.00 |
| Euro Tread Corp. | May 31, 2018 | $  917,000.00 |
| Euro Tread Corp. | June 25, 2018 | $1,000,000.00 |

29. On July 10, Judge Mazzant granted writs of attachment for accounts held by Euro Tread and the Castro Family Trust. *Order,* at 3. (SEALED Dkt. #27). Days later, Defendant John Eckerd filed a bankruptcy, though, that stayed the writs. Plaintiff never ascertained whether Euro Tread, the Castro Family Trust or any of the institutions holding their proceeds complied with this Court's orders. During a meeting of his creditors on August 17, 2018, John Eckerd <u>testified</u> that the Castro Family Trust has been lending him some $50,000 a month. The following day, Judge Mazzant entered a preliminary injunction finding once more that special and extraordinary circumstances and that "a substantial threat of irreparable injury" warranted exercise of the Court's equitable power. *See Tujague v. Eckerd,* 2018 WL 3376967 *3 (E.D. Tex. July 11, 2018)

PLAINTIFF'S ORIGINAL COMPLAINT

30. On September 5, 2018, Plaintiff filed a second lawsuit against. In this second, *Tujague v. Adkins and the Castro Family Trust,* Civil Action 4:18-cv-0631, Judge Mazzant once again found that exigent circumstances required that the Court take immediate action to prevent the dissipation. With bank records obtained in *Tujague v. Eckerd,* before Eckerd and some of his shell companies dashed off to bankruptcy court, Plaintiff was able to deduce that in the weeks and months surrounding the Landash bankruptcy, Eckerd had set up, at least, one new shell and transferred almost $3.5 million to a Wells Fargo account his in-laws had only set up in January of this year.

31. After issuing the temporary restraining order, Judge Mazzant ordered the parties to appear in his Court on September 20th. During that hearing, Judge Mazzant once again found the need to maintain the status quo and prevent asset dissipation, extending the temporary restraining order until **October 4, 2018** at **11:59 p.m.** *See Tujague v. Adkins,* 2018 WL 4538270, at *2-3. He likewise determined, though, that the fraudulent transfer claims were core proceedings of the bankruptcy estate and ordered that those claims be transferred to this Court, as the bankruptcy court is "strong[ly] presume[ed] to be the proper forum. *Tujague v. Adkins,* 4:18-cv-0631, *Order,* at 3, (Dkt # 29).

32. On that same day, John Keith Eckerd took the stand and invoked the Fifth Amendment privilege repeatedly about his role in the conspiracy and his disposition of the proceeds. Questions concerning whether he instructed "Jason Adkins or some other person to wire proceeds to Euro Tread" were met with claims against self-incrimination. John Eckerd Trans., at 18:15-18

33. Questions concerning ownership or control of Euro Tread were likewise met with assertions of the Fifth Amendment privilege. Trans. at 3:22-24. He would likewise not admit to

*when* he "set up Euro Tread." Trans., at 30:3-6.

> Q. Isn't it true that Euro Tread is just a continuation of the same scheme that was concocted with respect to Landash Corp? Trans., at 30:13-16.
>
> A. I'm going to assert my Fifth Amendment. Trans., at 30:13-16.

34. Eckerd likewise made sure to shield himself from the fraudulent transfers to his in-laws' trust.

> Q. Isn't it true that just a few weeks before you filed your bankruptcy that Euro Tread wired a million dollars to the Castro Family Trust?
>
> A. I'm going to assert my Fifth Amendment. Trans., at 31:19-22.

35. Eckerd repeatedly urged the privilege against self-incrimination with respect to each transfer to the Trust made this year.

## III.

## CAUSES OF ACTION

## RICO CONSPIRACY

32. Plaintiff realleges and incorporate the allege the facts previously stated. Plaintiff expressly pleads caused of action pursuant to the Racketeer Influenced Corrupt Organizations Action. *See* Title 18 U.S.C. § 1962(a)-(d). The evidence and facts adduced establish that (1) Adkins with and through his corporate entities and with other co-conspirators, including but not limited to John Eckerd, and an unnamed co-conspirator has (2) engaged in a pattern of racketeering activity (3) connect to the acquisition, establishment, conduct, or control of an enterprise. These acts and omissions were made intentionally, knowingly, recklessly and with criminal negligence, and injured and damaged Plaintiff. These specific acts and omissions included the following:

   a. Acting in concert with Eckerd and other individuals, and entities, Adkins was

responsible for soliciting Plaintiff and others to buy tires and or provide financing for fraudulent transactions.

b. Acting in concert with other individuals, and entities, Eckerd and Adkins and/or their co-conspirators maintained a tire facility in Houston with an inventory of tires that could be repeatedly employed as bait to entice Plaintiff, and others in fabricated sales.

c. Acting in concert with other individuals Eckerd and Adkins and/or their co-conspirators, and entities, Defendant Adkins caused phony transaction documents to be produced.

d. Acting in concert with Adkins and other individuals, and entities, Defendant Adkins caused others to confirm shipment and deliveries of tires—which had not occurred—which caused Plaintiff to wire more than $12.9 million in individual wires as delineated in Exhibit "A."

e. Acting in concert with Adkins and other individuals, and entities, Defendant Adkins intended that Plaintiff rely on these oral and written representations to induce Plaintiff to wire the funds in the transactions depicted,

f. Acting in concert with Eckerd and other individuals, and entities, Defendant Adkins represented to Plaintiff that the OTR venture was a good investment opportunity, and that Adkins and others were worthy of trust.

g. Acting in concert with Adkins and other individuals, and entities, Eckerd and Adkins and/or their co-conspirators caused harmful and damaging representations to be made that specific buyers had been identified for the tires existed throughout the United States, and abroad.

h. Acting in concert with Adkins and other individuals, and entities, Eckerd and Adkins and/or their co-conspirators fraudulently caused Plaintiff to transmit the more than $12.9 million in combined wire transfers in violation of 18 U.S.C §§ 1343, 1957, and 1962.

    i.    Acting in concert with other individuals, and entities, Eckerd and Adkins caused further harm by laundering money, engaging in monetary transactions in property deprived from unlawful activity, transportation of stolen money, and receipt of stolen money in violation of 18 18 U.S.C §§ 1956, 1957, 2314 and 2315.

33.    Eckerd and Adkin's additional pattern of criminal conduct include the following:

a.    Committing wire fraud in some 40 different transactions (13 U.S.C. § 1343);

b.    Committing conspiracy to commit wire fraud in some forty different transactions (18 U.S.C. § 371);

c.    Violating state penal and common law statutes, by and through, the transfers identified. *See* Tex. Pen. Code § 31.05, and Tex. Civ. Prac. & Rem. Code § 134.005; *see further below* ("TUFTA") Texas Business and Commerce Code Sections 24.005 and 24.006;

d.    Previous Ponzi and creditor schemes, as identified, with Adkins and other co-conspirators;

e.    Eckerd has been charged, remains out on bond and has entered plea negotiations for conspiracy to launder proceeds in violation of U.S.C. § 1956 from a Columbian drug cartel through his Trident Lakes development in Fannin County, Texas, *see U.S. v. Eckerd,* 2:18-mj-03556, U.S. District Court of New Jersey

34.    Knowing or having reason for knowing about the rampant criminal activity committed by Eckerd, Adkins and their co-conspirators, Defendant Castro Family Trust fostered this conspiracy further knowingly receiving funds stolen and transferred interstate commerce. Defendant Castro Family Trust has no basis to believe that Eckerd was running a legitimate business given

35. Defendant Castro Family Trust further agreed with Eckerd, Adkins and/or their conspirators to commit overt acts that advanced their racketeering activity. Those overt acts included:

a. receiving funds stolen in interstate commerce;

b. secreting funds in stolen in interstate commerce;

c. hindering one or more creditors of Landash Corporation;

d. opening a bank account for the express purpose of receiving stolen funds;

e. representing to third parties that they had "loaned" proceeds to Eckerd, which in fact, were the fruits of fraud;

f. "lending" money to Eckerd to conceal fraudulent transfers;

36. Plaintiff realleges and incorporates all previously stated facts for this cause of action. Plaintiff specifically pleads all causes of action arising from the Texas Theft Liability Act. Tex. Civ. Prac. & Rem. Ann. §§ 134.001 et seq.

**FRAUDULENT TRANSFER**

37. Plaintiff realleges and incorporates all previously stated facts for this cause of action. The above-described acts constitute one or more fraudulent transfers or conveyances of Plaintiff's assets by or to Defendant. In an effort to shield Plaintiff's assets from Plaintiff's lawful abilities to collect a judgment, Eckerd, Adkins and their co-conspirators fraudulently transferred Plaintiff's and Landash Corporation's assets and cash to Defendant. Defendant received such assets in fraud on Plaintiff and took some or all of the benefits derived from those transfers and assets.

38. The evidence overwhelmingly shows Eckerd, Adkins and their co-conspirators were engaged in a Ponzi scheme. Transfers made in furtherance of Ponzi schemes have achieved a

special status in fraudulent transfer law. Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actually fraudulent transfers under Bankruptcy Code § 548(a)(1). *E.g., Hayes v. Palm Seedlings Partners–A (In re Agricultural Research & Technology Group, Inc.),* 916 F.2d 528, 535–36 (9th Cir.1990).

39. Likewise, Defendant Castro Family is also a "transferee" under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Through the fraudulent transfers, Defendant Castro Family Trust and Eckerd, Adkins and their co-conspirators caused Landash Corporation to become insolvent and unable to pay its obligations as they became due or deepened its preexisting insolvency.

40. Plaintiff's claim as a defrauded party arose before, and its claim, within a reasonable time after Defendant's receipt of fraudulent transfers. The transfers were a fraud against Plaintiff's rights because:

- the transfers were made by Defendant with the actual intent to hinder, delay, or defraud Plaintiff and Landash's other creditors; or

- the transfers were made by Defendant without Landash receiving reasonably equivalent (or any) value in exchange for the property, rights, and assets transferred;

- Landash was insolvent when the transfers were made or became insolvent as a result of them (given its prior and continued failure to pay its bills); and/or

- Defendant caused Landash to make the transfers to one or more insiders (Eckerd, La Mi Bella Familigia, Trident Lakes Property Holdings, Rebekah Holdings, Jason Adkins, Iron City, Progressive Coal, Euro Tread Corporation) as that term is used by statute;

Defendant's' actual intent to hinder, delay, or defraud Plaintiff and other creditors is evident in that the allegations support that the following badges of fraud are present here:

- The transfers were to insiders;

- the transfers were concealed;

- the transfers comprised substantially all of Landash's assets, leaving it a shell company without contracts, a supply chain, or revenue, and with a mountain of debt;

- Defendant caused Landash to remove or conceal assets by transferring them to co-conspirators and insiders;

- Neither Plaintiff nor Landash did not receive reasonably equivalent value (or apparently any) for the transfers;

- Landash was insolvent at or shortly after the transfers, as shown by its inability to pay the note underlying the judgment, or its bills and taxes, as they came due; and

- The transfers occurred shortly before and after a substantial debt was incurred.

41.  Accordingly, Defendant Castro Family Trust has violated Texas Business and Commerce Code Sections 24.005 and 24.006.

## DAMAGES AND REMEDIES

42.  Plaintiff realleges and incorporates all previously stated facts for this cause of action against Defendant. As a result of the acts of Defendant, Plaintiff has suffered economic damages. Plaintiff alleges that Plaintiff thus seeks

- Actual damages;
- Exemplary damages;
- RICO treble damages;
- Attachment of real property acquired with Plaintiff's converted funds;
- Seizure of chattels acquired with Plaintiff's converted funds;
- avoidance of the transfers to the extent necessary to satisfy Plaintiff's claim;
- attachment or other provisional remedy against the assets fraudulently transferred or other property of Defendant(s);
- an injunction against further disposition of the assets fraudulently;
- transferred or of other property, by Defendant(s) or another transferee, or
- appointment of a receiver to take charge of the asset(s) fraudulently;

- judgment against Defendant, jointly and severally;
- attorneys' fees pursuant to the RICO Act, TUFTA, and the TTLA;
- costs of court;
- pre-judgment interest; and
- and any relief to which Plaintiff is justly entitled.

43. Plaintiff demands a trial by jury.

Respectfully submitted,

**HENLEY & HENLEY, P.C.**

By:   /s/  Geoff J. Henley
Geoff J. Henley, *Pro Hac Vice* pending
State Bar No. 00798253
2520 Fairmount, Suite 200
Dallas, Texas 75201
Telephone Number:  (214) 821-0222
Facsimile Number:  (214) 821-0124

**ATTORNEYS FOR PLAINTIFF
LUCIEN J. TUJAGUE, JR.**